FILED
2012 May-01  AM 10:01
U.S. DISTRICT COURT
N.D. OF ALABAMA

## IN THE UNITED STATES DISTRICT COURT FOR THE
### NORTHERN DISTRICT OF ALABAMA
### NORTHWESTERN DIVISION

| | | |
|---|---|---|
| **JACKIE D. HALL**, | ) | |
| | ) | |
| **Plaintiff** | ) | |
| | ) | |
| **v.** | ) | **CIVIL ACTION NO. 3:11-CV-01134-KOB** |
| | ) | |
| **MICHAEL J. ASTRUE**, | ) | |
| **Commissioner of the Social**, | ) | |
| **Security Administration** | ) | |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM OPINION

## I. INTRODUCTION

On May 14, 2008, the claimant, Jackie D. Hall, applied for disability insurance benefits under Title II of the Social Security Act and supplemental security income under Title XVI of the Social Security Act. (R. 11). The claimant originally alleged disability commencing on March 31, 2008, but amended his statement to allege disability commencing on April 14, 2008. The claimant alleges disability because of residual pain from traumatic injuries to his left foot and ankle and a history of multiple fractures of his left arm and hand. The Commissioner denied the claim, and the claimant filed a timely request for a hearing before an Administrative Law Judge (ALJ). The ALJ held a hearing on November 12, 2009. (R. 13). In a decision dated January 22, 2010, the ALJ found that the claimant was not disabled as defined by the Social Security Act, and thus, was ineligible for disability insurance benefits and supplemental security income. (R. 21). On March 22, 2011, the Appeals Council denied the claimant's request for review; consequently, the ALJ's decision became the final decision of the Commissioner of the Social

Security Administration. (R. 1). The claimant has exhausted his administrative remedies, and this court has jurisdiction pursuant to 42 U.S.C. §§ 405(g) and 1631(c)(3). For the reasons stated below, this court affirms the decision of the Commissioner.

## II. ISSUES PRESENTED

The claimant presents the following issues for review:

1.      whether the ALJ properly applied the Eleventh Circuit's three-part pain standard;

2.      whether the ALJ properly discredited the testimony of the claimant's treating physician; and

3.      whether the ALJ properly determined the claimant's residual functional capacity to do light work with certain limitations.

## III. STANDARD OF REVIEW

The standard for reviewing the Commissioner's decision is limited. This court must affirm the Commissioner's decision if the Commissioner applied the correct legal standards and if the factual conclusions are supported by substantial evidence. *See* 42 U.S.C. § 405(g); *Graham v. Apfel*, 129 F.3d 1420, 1422 (11th Cir. 1997); *Walker v. Bowen*, 826 F.2d 996, 999 (11th Cir. 1987).

"No. . . presumption of validity attaches to the [Commissioner's] legal conclusions, including determination of the proper standards to be applied in evaluating claims." *Walker*, 826 F.2d at 999. This court does not review the Commissioner's factual determinations *de novo*. The court will affirm those factual determinations that are supported by substantial evidence. "Substantial evidence" is "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402

U.S. 389, 401 (1971).

The court must "scrutinize the record in its entirety to determine the reasonableness of the [Commissioner's] factual findings." *Walker*, 826 F.2d at 999. A reviewing court must not look only to those parts of the record that support the decision of the ALJ, but also must view the record in its entirety and take account of evidence that detracts from the evidence relied on by the ALJ. *Hillsman v. Bowen*, 804 F.2d 1179, 1180 (11th Cir. 1986).

## IV. LEGAL STANDARD

Under 42 U.S.C. § 423(d)(1)(A), a person is entitled to disability benefits when the person cannot "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). To make this determination, the Commissioner employs a five-step, sequential evaluation process:

> (1) Is the person presently unemployed?
> (2) Is the person's impairment severe?
> (3) Does the person's impairment meet or equal one of the specific impairments set forth in 20 C.F.R. pt. 404, subpt. P, app. 1?
> (4) Is the person unable to perform his or her former occupation?
> (5) Is the person unable to perform any other work within the economy?
>
> An affirmative answer to any of the above questions leads either to the next question, or, on steps three and five, to a finding of disability.  A negative answer to any question, other than step three, leads to a determination of "not disabled."

*McDaniel v. Bowen*, 800 F.2d 1026, 1030 (11th Cir. 1986); 20 C.F.R. §§ 404.1520, 416.920.

In evaluating pain and other subjective complaints, the Commissioner must consider whether the claimant demonstrated an underlying medical condition, and *either* "(1) objective medical evidence that confirms the severity of the alleged pain arising from that condition *or* (2)

3

that the objectively determined medical condition is of such a severity that it can reasonably be expected to give rise to the alleged pain." *Holt v. Sullivan*, 921 F.2d 1221, 1223 (11th Cir. 1991) (emphasis added); *see also Wilson v. Barnhart*, 284 F.3d 1219, 1225-26 (11th Cir. 2002); 20 C.F.R. § 404.1529.

Additionally, in making the disability determination, the ALJ must give "substantial [or] considerable weight" to the opinion, diagnosis, and medical evidence of the claimant's treating physician unless good cause exists for not doing so. *Jones v. Bowen*, 810 F.2d 1001, 1005 (11th Cir. 1986); *Broughton v. Heckler*, 776 F.2d 960, 961 (11th Cir. 1985). The ALJ may reject any physician's opinion if the evidence supports a contrary finding. *Sryock v. Heckler*, 764 F. 2d 834, 835 (11th Cir. 1985). However, if the ALJ discredits the opinion of a treating physician, he must "clearly articulate" his reasons for doing so. *Phillips v. Barnhart*, 357 F.3d 1232, 1241 (11th Cir. 2004).

Finally, the ALJ determines a claimant's residual functional capacity by considering all of the relevant evidence and assessing the claimant's ability to work despite his impairments. *Lewis v. Callahan*, 125 F.3d 1436, 1440 (11th Cir. 1997); 20 C.F.R. § 404.1520(f). If, based on all the evidence, the ALJ determines that a claimant cannot do a full or wide range of work, he must consult a vocational expert to determine whether a claimant can perform work that exists in the regional and national economy. *Phillips v. Barnhart*, 357 F. 3d 1232, 1242 (11th Cir. 2004).

## V. FACTS

The claimant has a ninth-grade education and was forty-four years old at the time of the administrative hearing. (R. 36, 33). His past work experience includes employment as a livestock rancher and a truck driver, including intermittent periods as a self-employed truck driver. (R.

252, 37). The claimant alleges that he is unable to work because of severe pain in his left leg, foot, arm, and hand. (R. 43). The ALJ concluded that the claimant is obese; however, on appeal, the claimant did not contest the ALJ's findings regarding the impact of his obesity on his ability to work. (R. 13). The claimant testified that the pain on the left side of his body results from injuries he sustained while trying to fix a truck tire that exploded in 1991. (R. 43).

*Physical Limitations*

On August 8, 1991, the claimant sustained injuries to his left side when a truck tire he was repairing exploded. (R. 16). The claimant entered the Regional Medical Center at Memphis Trauma Center with multiple fractures and a dislocated hip. The claimant underwent multiple orthopedic procedures and discussed with his doctor the "significant possibility that the foot may not be salvageable and that future amputation [was] highly possible." On September 3, 1991, the hospital released the claimant with an above-the-elbow cast on his left arm. (R. 261-62).

On January 19, 1994, Dr. Raymond Nichols, a treating physician at Eliza Coffee Memorial Hospital, examined the claimant. Dr. Nichols noted that the claimant's x-rays demonstrated an "essentially complete absence of the talus," an important ankle bone. Dr. Nichols also noted that the claimant would benefit from ankle surgery. (R. 231-232).

On March 17, 1994, Dr. Nichols performed a left tibiocalcaneal ankle fusion on the claimant. The hospital released the claimant on March 21, 1994. The claimant began using crutches and was "independent with therapy." Dr. Nichols prescribed the claimant Anspor and Lorcet. (R. 215-16).

On June 17, 1994, Dr. Nichols conducted a follow-up examination of the claimant. Dr. Nichols noted that x-rays indicated that the claimant's ankle might not be fusing properly. However, the claimant appeared to be "doing quite well." Dr. Nichols prescribed Lortab for the

5

claimant's pain. (R. 206).

On November 15, 1994, Dr. Nichols examined the claimant and noted "nonunion" of the "left tibiocalcaneal arthrodesis." Dr. Nichols recommended immediate treatment consisting of a short leg cast and bone stimulator, but ultimately determined that the claimant would probably need another fusion surgery.  (R. 201).

On April 4, 1995, the claimant sought another opinion on the second fusion from Dr. Richard Sanders, a consulting physician, at HealthSouth Sports Medicine. Dr. Sanders opined that a second fusion would only have a forty to fifty percent chance of working. The claimant decided not to have the second surgery. Dr. Sanders prescribed a brace for the claimant. The claimant determined that if the brace did not produce good results, he would have his leg amputated. (R. 234).

On June 19, 1995, the claimant had a follow-up exam with Dr. Nichols. Dr. Nichols noted that an x-ray of the claimant showed "obvious nonunion of his attempted tibiocalcaneal arthrodesis." Dr. Nichols further noted that the claimant was not interested in a repeat surgery and that the claimant was "fairly comfortable" in his brace. Dr. Nichols concluded that he had no more treatment options for the claimant and that the claimant should not climb, work off the ground, squat, or kneel because of complications with his brace. (R. 200).

On January 4, 1996, Ms. Donna Johnston, a work hardening specialist, and Ms. Brenda Austin, a physical therapist, both of Healthsouth Sports Medicine and Rehabilitation Center, performed a Work Capacities Assessment of the claimant. (R. 255). Ms. Johnston and Ms. Austin noted that the claimant had a normal posture and, aside from his left ankle, had a normal range of motion. The claimant exhibited weakness in his left appendages, a deviated gait, and claimed to have a pain level of four out of ten. The claimant "used improper body mechanics

throughout lifting," but was able to lift and carry between eight and one hundred pounds in twelve circuits over the course of an hour. (R. 251-54). The claimant sat for thirty minutes, stood for seven minutes, walked .40 miles, and climbed thirty steps. Ms. Johnston and Ms. Austin noted that the claimant's sitting ability was "adequate for job performance," but that his standing, walking, and stair climbing abilities were not. Ms. Johnston and Ms. Austin concluded that the claimant could perform work in the light to medium category and that the claimant's ankle pain restricted his standing, walking, stair climbing, and crouching ability, but that the claimant had unrestricted sitting, reaching, crawling, squatting, kneeling and stooping abilities. (R. 250).

On February 21, 1997, Dr. Nichols examined the claimant after he had suffered pain, discoloration, and swelling in his left ankle for a week. Dr. Nichols gave the claimant Lorcet Plus for severe pain and prescribed Ultram. Dr. Nichols also advised the claimant to ice and elevate his ankle. Dr. Nichols noted that if the claimant had "smoldering osteomyelitis, then any further attempts at reconstructive surgery. . .would be at high risk for failure." The claimant suggested the possibility of "elective below the knee amputation," if his pain did not improve, which Dr. Nichols stated was a "reasonable option." (R. 199).

On March 7, 1997, the claimant followed-up with Dr. Nichols. The claimant thought he might have an infection in his foot because of the continued pain and swelling of his left ankle and foot. Dr. Nichols noted that the claimant was less functional "than a patient with a well performed [below the knee amputation] and a good prosthesis," but that the claimant's decreased capability might be a result of a "twisting injury" he sustained a month before the appointment. Dr. Nichols prescribed the claimant more Lorcet and advised that the claimant wait to have any additional surgeries. (R. 198).

On July 08, 2008, Dr. Clarke Woodfin, Jr., a consulting physician at Mose Clarke

Woodfin Jr MDPC, examined the claimaint. Dr. Woodfin noted that the claimant used "both hands to remove his socks and boots" and unbutton his shirt. The claimant sat still for twenty minutes while Dr. Woodfin inquired about his medical history. Aside from his leg brace, the claimant used no assistive device. Dr. Woodfin noted that the claimant stood and sat down "in a normal fashion at normal speeds," but put "increased weight on the arms of the side chair." Dr. Woodfin also noted that the claimant had no trouble getting on the examination table, but was unable to walk on his toes or heels and experienced pain in both knees when trying to squat. Dr. Woodfin further noted that the claimant showed "a bony prominence on the dorsal surface of the [third] metacarpal" and that the claimant's left ankle was "grossly deformed and enlarged." Dr. Woodfin further noted that the claimants "left pinch and grip [was] 5/5," and was "slightly weaker than the right side." Dr. Woodfin concluded that the claimant could occasionally stand and walk; had no sitting limitations; had normal manual dexterity; and that the claimant's statements that he could only lift twenty to twenty-five pounds were accurate. (R. 171-72).

On July 23, 2008, Dr. J.A. Tomlinson, a treating physician, began to treat the claimant for heel and ankle pain and pain and swelling in his hands. (R. 183).  Dr. Tomlinson prescribed Hydrocodone for the claimant's pain. (R. 144). Dr. Tomlinson continued to treat the claimant through September 24, 2009, and the claimant complained of no new complications during that period. (R. 190–94). In November 2009, Dr. Tomlinson completed a residual functional capacity questionnaire about the claimant. Dr. Tomlinson noted that the claimant suffered from severe pain; was "incapable of even 'low stress' jobs;" could only grasp, turn or twist objects with his right hand for half of an eight hour work day and with his left hand only one percent of an eight hour workday; could do fine manipulations with his right fingers for half a workday and could do no fine manipulations with his left fingers; and could reach overhead with both hands sixty

percent of an eight hour workday. (R. 577-80).

*The ALJ Hearing*

After the Commissioner denied the claimant's request for disability insurance benefits and supplemental security income, the claimant requested and received a hearing before an ALJ. (R. 11). At the hearing, the claimant testified that he experiences constant pain and swelling in his left leg and ankle. The claimant also testified that he is unable to make a fist because of arthritis in his left index fingers. (R. 43). He further testified that he can lift forty to fifty pounds with his right hand and thirty to forty pounds with his left hand. (R. 41). The claimant also testified that he could pick up a microphone and thought that he could open a door with his left hand. (R. 46-48).

The claimant testified that after his surgery, he began using a boot, but that he still thinks about having his leg amputated at times. He testified that the pain in his left leg varies from a level of six to ten on a scale of one to ten. The claimant also testified that he has to elevate his left leg approximately half the day. (R. 45-50).

The claimant testified that he can sit for about one or two hours before needing to walk. He also testified that he can only stand about ten or fifteen minutes before he needs to sit down. The claimant testified that he can walk about one hundred feet before stopping and that he is most comfortable while lying down. He also testified that at times he must use his right foot to push the clutch while driving because he feels pain in his left foot when he pushes the clutch. The claimant further testified that he has trouble getting in and out of his truck and that when he drives, his left foot hurts constantly. (R. 41-43).

A vocational expert, Mr. Elliott, testified concerning the type and availability of jobs that the claimant was able to perform. The ALJ asked Mr. Elliott if job opportunities exist for an

individual with the claimant's age, education and work experience who could stand or walk for fifteen minutes at a time; could sit for an hour during a six to eight hour period; could lift twenty to forty pounds; and has limited use of his left hand. Mr. Elliott responded that under these constraints, the claimant could be a gate guard, counter clerk, or food sales clerk. (R. 49-52).

The ALJ further questioned Mr. Elliott by asking whether an individual's absences from work; need to elevate his leg; inability to climb ladders, ropes, and scaffolds; and need to "avoid exposure to hazardous machinery or unprotected heights" would impact his ability to maintain gainful employment. Mr. Elliott replied that an individual would not be able to maintain gainful employment if he missed more than two days a month of work within a nine month period or needed to elevate his leg up to eighteen inches for more than three hours of an eight hour workday. However, Mr. Elliott also testified that an individual would be permitted to elevate his leg during his lunch period and that an individual's inability to climb ladders and scaffolds or withstand exposure to hazardous machinery or unprotected heights would not preclude him from maintaining gainful employment. (R. 50-51).

The claimant's attorney, Mr. Wright, then questioned Mr. Elliott about the claimant's ability to maintain gainful employment. Mr. Wright asked Mr. Elliott whether an individual under the constraints listed by the ALJ who also regularly experienced a pain level of seven out of ten would still be able to maintain employment. Mr. Elliott responded that an individual who suffered pain of that intensity would not be able to sustain any gainful employment. The ALJ then asked Mr. Elliott whether an individual who experienced a pain level of five or six out of ten would be able to sustain gainful employment. Mr. Elliott responded that a pain level of five or six out of ten would be moderate and would not preclude the individual from sustaining gainful employment. (R. 51-52).

10

*The ALJ's Decision*

On January 22, 2010, the ALJ issued a decision finding the claimant was not disabled under the Social Security Act. (R. 21). First, the ALJ found that the claimant met the insured status requirements of the Social Security Act through December 31, 2013. Next, the ALJ found that the claimant had not engaged in substantial gainful activity since the alleged onset of his disability. The ALJ then found that the claimant's "residuals of traumatic injuries to the left foot and ankles, history of multiple fractures of the left arm and hand, and obesity" qualified as severe impairments; he concluded, however, that these impairments did not singly or in combination manifest the specific signs and diagnostic findings required by the Listing of Impairments. (R. 13-14).

Next, the ALJ considered the claimant's subjective allegations of pain to determine whether he had the residual functional capacity to perform past relevant work or light work. (R. 14-19). The ALJ found that the claimant was unable to perform past relevant work, but that the claimant had the residual functional capacity to perform light work with limitations of standing or walking for fifteen minutes at a time for a maximum of two out of eight hours; sitting at least an hour at a time for no more than six out of eight hours; occasionally lifting twenty to forty pounds; limited use of his left hand and inability to perform assembly jobs requiring "bilateral manual dexterity or fine dexterity" of the left hand; and inability to climb ladders, ropes or scaffolds or withstand exposure to hazardous machinery or unprotected heights. The ALJ found that "the claimant's medically determinable impairments could reasonably be expected to cause most of the alleged symptoms," but that "the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms" were not credible. (R. 16).

To support his conclusion, the ALJ referenced the treatment notes of Dr. Tomlinson, Dr.

Nichols, Dr. Taylor, Dr. Woodfin, the Work Capacities Evaluation performed by Ms. Johnston and Ms. Austin and the disability and function reports filed by the claimant. (R. 16-19). The ALJ noted that although the claimant has trouble making a fist with his left hand, he testified that he thought he could open a door with his left hand and was able to pick up the microphone with his left hand at the hearing. The ALJ found that although the claimant alleged that the Hydrocodone Dr. Tomlinson prescribed him made him drowsy, no record of any adverse side effects of the medication existed in Dr. Tomlinson's medical records. The ALJ then found that although the claimant was obese, no evidence existed in the record to support a finding that the claimant's obesity would impede his ability to work. (R. 15-16).

Next, the ALJ found that Ms. Johnston and Ms. Austin's report supported his conclusion because it indicated that the claimant "was unrestricted in overhead reach," could lift frequently, and could perform light or medium work. The ALJ further noted that during the evaluation, the claimant performed twelve circuits of lifting and carrying up to one hundred pounds. (R. 16). The ALJ also noted that in his disability report, the claimant stated that as a full-time truck driver from 1998 until 2008, he "handled/grabbed/grasped big objects about three hours a day" and "sat for 8 hours a day." The ALJ noted that the claimant wrote in his function report that he "showered, went shopping weekly, had no difficulty dressing, bathing caring for his hair, shaving, eating or using the toilet" and that he mowed the yard for about thirty minutes at a time. (R. 17).

Next the ALJ considered the record pertaining to the claimant's leg and foot injuries. The ALJ noted that although the claimant testified that he considered amputation of his left foot, on June 19, 1995, he declined Dr. Nichols's suggestion of "repeat fusion surgery" and "reported that the brace was doing fairly well." The ALJ also noted that in their work capacities assessment,

12

Ms. Johnston and Ms. Austin concluded that the plaintiff could perform light to medium work because he performed twelve circuits lifting more than thirty pounds and could sit constantly, stand for seven minutes, walk .40 miles, and climb thirty stairs. (R. 18).

The ALJ also considered Dr. Nichols' records from March 7, 1997. The ALJ noted that although the claimant mentioned amputating his left foot, Dr. Nichols observed that the claimant had been functioning much better before a recent twisting injury and recommended that the claimant hold off on any elective amputation. The ALJ further noted that the claimant did not seek medical treatment for his leg again until July, 2008. The ALJ then noted that in his July 08, 2008 consultation with Dr. Woodfin, the claimant sat for twenty minutes straight, used no assistive devices other than his brace, stood and sat down at a normal speed, had no difficulty getting on the examination table, and that the claimant experienced minimal pain in the examination except for when squatting. The ALJ further noted that Dr. Woodfin observed that the claimant was able to use both hands to remove his socks and boots and unbutton his shirt and the claimant's "left pinch and grip were 5/5."  (R. 18).

Next, the ALJ considered the claimant's testimony at the hearing that he could "lift up to 40-50 pounds with the right arm and 20-30 pounds with the left arm, sit one hour or so, stand 10-15 minutes, and walk 100 feet or so." Accordingly, the ALJ gave little weight to Dr. Tomlinson's 2009 functional capacity assessment that the claimant was unable to handle even low stress jobs and could only stand five minutes at a time, required many unscheduled breaks during the workday, was likely to be absent from work more than four days a month, could rarely or never stoop, crouch, squat or climb stairs, and could lift less than ten pounds occasionally. The ALJ noted that although Dr. Tomlinson examined the claimant eight times, "the examinations were apparently quite superficial" and contradicted the overall record affirming the claimant's ability

13

to work within the restrictions outlined by the ALJ. The ALJ observed that Dr. Tomlinson's notes only referenced the claimant's hands once when the claimant complained of swelling and pain in both hands during the initial assessment and Dr. Tomlinson only noted some tenderness in the claimant's hand. (R. 19).

Based on the record as a whole, the ALJ concluded that even believing the claimant's testimony that he needs to elevate his leg regularly, has sitting limitations, and needs to take unscheduled breaks, "the claimant's allegations of symptoms and limitations [were] credible only to the extent that he has the functional limitations" outlined by the ALJ. (R. 19). Based on these findings and testimony from the vocational expert, the ALJ concluded that the claimant retains the capacity for work that exists in significant numbers in the national economy and, therefore, is not disabled under the Social Security Act. The ALJ further noted that, in the past, the claimant's limitations did not prevent him from working. The ALJ concluded that "the claimant turned back his leased truck for what was believed to be economic reasons and the high cost of fuel" and that "he did not want to go in the hole by working." The ALJ noted that he personally did not believe the claimant was unable to perform past work as a truck driver, but that because Mr. Elliott highlighted several jobs that the claimant could perform, the claimant was not totally disabled. (R. 20-21).

## VI. DISCUSSION

1.  **Whether the ALJ Properly Applied the Eleventh Circuit's Three-Part Pain Standard**

The claimant argues that the ALJ improperly applied the Eleventh Circuit's three-part pain standard. To the contrary, this court finds that the ALJ properly applied the pain standard and that substantial evidence supports his decision.

14

The three-part pain standard applies when a claimant attempts to establish disability through his or her own testimony of pain or other subjective symptoms. *Holt v. Sullivan*, 921 F.2d 1219, 1223 (11th Cir. 1991). "The pain standard requires (1) evidence of an underlying medical condition and *either* (2) objective medical evidence that confirms the severity of the alleged pain arising from that condition *or* (3) that the objectively determined medical condition is of such a severity that it can be reasonably expected to give rise to the alleged pain." *Id.* (emphasis added). A claimant's subjective testimony supported by medical evidence that satisfies the pain standard is itself sufficient to support a finding of disability. *Foote v. Chater*, 67 F.3d 1553, 1561 (11th Cir. 1995).

In applying the three-part standard, if the ALJ decides not to credit a claimant's subjective testimony of pain, he must discredit it explicitly and articulate his reasons for doing so. *Brown v. Sullivan*, 921 F.2d 1233, 1236 (11th Cir. 1991). Failure to articulate the reasons for discrediting the claimant's subjective complaints of pain requires that the testimony be accepted as true. *Id.*

In this case, the ALJ conceded that the claimant suffers from an underlying medical condition capable of generating pain; however, he found that the entirety of the medical evidence failed to support the claimant's alleged severity of pain. On appeal, the claimant argues that the ALJ discredited his testimony because the ALJ believed that the reason the claimant stopped working as a truck driver was the increase in fuel prices in 2008. While the claimant correctly notes that "[a]n ALJ is not free to base his decision on hunches," *Davis v. Astrue*, 478 F. Supp. 2d 1342, 1348 (N.D. Ala. 2007), in this case, the ALJ's decision to discredit the claimant's subjective complaints of pain is supported by substantial evidence.

The ALJ explicitly articulated his reasons for discrediting the claimant's alleged severity of pain. First, he noted that at the hearing, the claimant was able to pick up the microphone with

15

his left hand and testified that he thought he could open a door with his left hand as well. Next, the ALJ referenced the work capacities evaluation performed by Ms. Johnston and Ms. Austin and noted that the claimant was able to do twelve circuits lifting and carrying up to one hundred pounds, sit for thirty minutes, stand for seven minutes, walk .40 miles, and climb thirty steps. The ALJ also referenced the disability report filed by the claimant and noted that the claimant stated that as a full-time truck driver, from 1998 to 2008, he handled large objects approximately three hours a day and sat for eight hours straight. Moreover, the ALJ referenced the claimant's function report in which he wrote that he had no difficulty showering, grocery shopping, dressing, bathing, shaving, or eating and that he could mow the lawn for thirty minutes at a time.

Next, the ALJ considered the claimant's consultation with Dr. Nichols on June 19, 1995 and noted that the claimant declined any additional surgery and felt fairly comfortable in his brace. The ALJ then referenced the claimant's visit with Dr. Nichols on March 7, 1997 and noted that although the claimant mentioned elective amputation, Dr. Nichols advised the claimant to wait before proceeding with the surgery. Dr. Nichols noted that the claimant should put off the surgery until he recovered from a twisting injury, because the claimant functioned much better before sustaining the twisting injury.

The ALJ then noted that the claimant did not seek medical attention for his leg from 1997 until 2008. In 2008, Dr. Woodfin examined the claimant, and, as the ALJ noted, the claimant had no trouble sitting for twenty minutes, used no assistive devices besides his leg brace, had no difficulty getting on the examination table, stood and sat down at normal speeds, used both hands to unbutton his shirt and remove his boots and socks, experienced minimal pain during the examination except for when squatting, and his left pinch and grip were 5/5.

The ALJ also considered the claimant's own testimony at the hearing that he could lift

forty to fifty pounds with his right arm and twenty to thirty pounds with his left arm, sit for about an hour, stand ten to fifteen minutes, and walk about one hundred feet. The ALJ noted that he personally did not believe the claimant was unable to perform past relevant work and that he believed the claimant gave up his work as an independent truck driver because of the increase in fuel prices in 2008. However, the ALJ did not ultimately base his decision on his personal beliefs about the claimant's disability. Instead, the ALJ considered the testimony of Mr. Elliott and the record as a whole, and, despite his personal beliefs, still found the claimant unable to perform any past relevant work. Thus, the ALJ's findings are not based on his hunches about the claimant, but are supported by the record as a whole.

Based on the explicit findings of the ALJ, this court concludes that he properly applied the Eleventh Circuit's three-part pain standard and that substantial evidence supports his decision.

**2.    Whether the ALJ Properly Discredited the Opinion of the Claimant's Treating Physician, Dr. Tomlinson**

The claimant also argues that the ALJ improperly discounted the testimony of the claimant's treating physician, Dr. Tomlinson. To the contrary, this court finds that the ALJ properly discredited Dr. Tomlinson's testimony and that substantial evidence supports his decision.

A treating physician is a doctor who has an "ongoing treatment relationship" with the claimant or someone the claimant "sees. . . with frequency consistent with accepted medial practice for the type of treatment and/or evaluation required for [the claimant's] medical conditions." 20 C.F.R. § 404.1502. While the ALJ must consider all medical opinions when making a disability determination, he does not have to accord an opinion rising out of a single

consultative examination the special deference he must give a treating physician's opinion. *Lewis v. Callahan*, 125 F.3d 1436, 1440 (11th Cir. 1997).

However, the ALJ may reject the opinion of any physician when the evidence supports a contrary conclusion. *Syrock v. Heckler*, 764 F.2d 834, 835 (11th Cir. 1985). Good cause to discredit a treating physician's opinion exists when no objective medical evidence accompanies the treating physician's opinion, the treating physician's opinion is wholly conclusory, or the physician's own treatment notes contradict his opinion. *Edwards v. Sullivan*, 937 F.2d 580, 583 (1991); *see also Phillips v. Barnhart*, 357 F.3d 1232, 1240–41 (2004). Further, the ALJ must "clearly articulate" his reasons for discounting the opinion of the treating physician. *Phillips v. Barnhart*, 357 F.3d 1232, 1241 (11th Cir. 2004).

In this case, the ALJ acknowledged Dr. Tomlinson as a treating physician, but discredited his testimony about the claimant's disability because the record, including the claimant's testimony and Dr. Tomlinson's own treatment notes, did not support Dr. Tomlinson's disability determination.

The ALJ explicitly articulated his reasons for discrediting Dr. Tomlinson's testimony about the claimant's disability. First, the ALJ noted that some weight should be given Dr. Tomlinson's testimony as a treating physician because he examined the claimant eight times. However, the ALJ also noted that Dr. Tomlinson treated the claimant from July 2008 until September 2009 and that aside from tenderness in the claimant's foot in July 2008, Dr. Tomlinson noted no other ailments.

The ALJ reasoned that Dr. Tomlinson's testimony that the claimant could only lift less than ten pounds occasionally, needed to take unscheduled breaks, could only stand for five minutes at a time, would likely be absent from work more than four days a month, and could not

even do low stress jobs was not credible because it conflicted with the record, including the

claimant's testimony and Dr. Tomlinson's own notes. The ALJ noted that Dr. Tomlinson's

observations as to the claimant's hand and arm limitations were inconsistent with Dr.

Tomlinson's notes from 2008 to 2009, which only mentioned some tenderness in the claimant's

hand during the initial examination. The ALJ further noted that although Dr. Tomlinson opined

that the claimant could only lift less than ten pounds and could not do low stress jobs, the

claimant himself testified that he could lift up to forty to fifty pounds with his right arm and

twenty to thirty pounds with his left arm, sit for about one hour straight, stand ten to fifteen

minutes before resting, and walk about one hundred feet before stopping.

Ultimately, the ALJ found that Dr. Tomlinson's notes, which listed no new complaints

after the initial assessment of hand tenderness, failed to rebut other evidence that the claimant

was capable of working, especially the claimant's "long history of work as a truck driver." The

ALJ concluded that because Dr. Tomlinson's assessment of the claimant's residual functional

capacity was inconsistent with the record, including the claimant's testimony and Dr.

Tomlinson's notes, Dr. Tomlinson's assessment merited little weight.

Based on the explicit findings of the ALJ, this court concludes that he sufficiently

articulated his reasons for discrediting Dr. Tomlinson's testimony about the claimant's disability

and that substantial evidence supports his decision.

**3.     Whether the ALJ Properly Determined the Claimant's Residual Functional
        Capacity To Do Light Work**

Lastly, the claimant argues that the ALJ improperly determined the claimant's residual

functional capacity to do light work**.** To the contrary, this court finds that the ALJ properly

determined the claimant's residual functional capacity and that substantial evidence supports his

decision.

The ALJ must "consult a vocational expert. . . when the claimant's exertional limitations prevent the claimant from performing a full range of employment." *Phillips v. Barnhart*, 357 F. 3d 1232, 1242 (11th Cir. 2004). If the ALJ finds that the claimant is incapable of performing a full range of work at a particular level "given [his] exertional limitations, then the ALJ must consult a vocational expert to determine whether there are sufficient jobs at the. . . work level within the national economy that [the claimant] can perform." *Id.*

In this case, the ALJ determined that the claimant could not perform the full range of light work, which "involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds." Yet, even if a job requires lifting very little weight, it still falls in the light work category if it "requires a good deal of walking or standing, or. . . sitting most of the time with some pushing and pulling of arm or leg controls." A claimant is "capable of performing a full or wide range of light work" if he has "the ability to do substantially all of these activities." 20 C.F.R. § 404.1567(b). However, after hearing Mr. Elliott's testimony, the ALJ found that the claimant could only perform light work with the following limitations: standing or sitting for fifteen minutes at a time; sitting at least one hour at a time for no more than six hours of an eight hour workday; occasional lifting of twenty to forty pounds; limited use of his left hand; and inability to climb ladders, ropes, or scaffolds or withstand exposure to hazardous machinery or unprotected heights.

On appeal, the claimant argues that the ALJ erred in determining that the claimant could perform limited light work, because the claimant's severe standing and walking impairments prohibit him from performing the work listed in the light work category. However, the claimant's argument fails because the Regulation states that a job falls in the light work category "when it

requires a good deal of walking or standing, *or when it involves sitting most of the time with some pushing and pulling of arm or leg controls*." Additionally, a claimant only has to be capable of performing substantially all of the activities listed as light work if the ALJ determines that the claimant can perform a *full or wide range* of light work. Thus, the claimant does not need to be capable of doing a good deal of walking or standing to be able to do light work because light work also includes jobs that have weight-lifting limits of ten to twenty pounds and jobs that require sitting most of the time with pushing and pulling. In this case, the ALJ did not err simply by finding that the claimant could do light work with certain limitations despite his standing and walking impairments. Because the ALJ did not find that the claimant is capable of performing the *full or wide* range of light work, the ALJ's conclusion that the claimant can perform light work with limitations does not require that the claimant have the ability to perform all of the activities in the light work category.

Moreover, the ALJ did not use the term "light work" in the hypothetical he presented Mr. Elliott. Thus, Mr. Elliott based his conclusion that the claimant can work in jobs that exist in significant numbers in the regional and national economy not on the ALJ's conclusion that the claimant can do a limited range of light work, but instead on the limitations that the ALJ presented him. The claimant does not argue that the ALJ presented Mr. Elliott with an improper hypothetical. Further, in addition to the objective evidence supporting the claimant's ability to work, the claimant also testified that he could lift twenty to thirty pounds with his left hand and forty to fifty pounds with his right hand, could stand for ten to fifteen minutes without resting and could sit for about an hour or two without getting up. Thus, the limitations presented by the ALJ find substantial support in the record.

After considering the claimant's exertional limitations and determining that the claimant

was unable to perform the full range of light work, the ALJ questioned Mr. Elliott about whether a claimant with similar limitations could still find employment. The ALJ considered Mr. Elliott's testimony that the claimant could still find work as a gate guard, counter clerk, or food sales clerk in determining that the claimant is not disabled. Based on the explicit findings of the ALJ, this court concludes that he properly determined the claimant's residual functional capacity and that substantial evidence supports his decision.

## VII. CONCLUSION

For the reasons as stated, this court concludes that the decision of the Commissioner is supported by substantial evidence and is to be AFFIRMED. The court will enter a separate order to that effect simultaneously.

DONE and ORDERED this 1st day of May, 2012.

KARON OWEN BOWDRE
UNITED STATES DISTRICT JUDGE

22